UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>c/o U.S. Attorney's Office<br>601 D Street, NW<br>Washington, DC 20530,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ALL PETROLEUM-PRODUCT CARGO<br>ABOARD THE SUEZ RAJAN WITH<br>INTERNATIONAL MARITIME NUMBER<br>9524475,<br><br>　　　　Defendant. | Civil A. No.<br><br>**FILED UNDER SEAL** |

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, Plaintiff the United States of America (the "United States"), by and through the United States Attorney's Office for the District of Columbia, which brings this verified complaint for forfeiture in a civil action *in rem*, in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure, against: All Petroleum-Product Cargo Aboard the *Suez Rajan* with International Maritime Number ("IMO") 9524475 ("Defendant Property"), and alleges as follows:

### NATURE OF THE ACTION AND DEFENDANT *IN REM*

1.　　This *in rem* forfeiture action arises out of an investigation by Homeland Security Investigations ("HSI") and the Federal Bureau of Investigation ("FBI"). Specifically, the United States is investigating the transportation and sale of Iranian oil products for the benefit of the Islamic Revolutionary Guard Corps ("IRGC") and the IRGC Quds Force ("IRGC-QF"). This action seeks to forfeit the Defendant Property which originated from oil terminals in Iran. Those

vessels utilized surreptitious means to hide the Defendant Property's Iranian origin and to transfer the Defendant Property onto other vessels moving the cargo into commerce by, and for the benefit of, the National Iranian Oil Company ("NIOC"), NITC, IRGC and the IRGC-QF, each of which has been designated by the U.S. Treasury Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia.

2.    The Defendant Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as foreign assets of the IRGC and IRGC-QF, designated foreign terrorist organizations, which have engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332B(g)(5) against the United States, citizens or residents of the United States, or their property, and as assets, or sources of influence by a person or entity over the IRGC and IRGC-QF.

3.    The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property that was involved in, and/or is traceable to property that was involved in, a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2)(A), that occurred when Company B caused a U.S. financial institution (U.S. Bank A) to facilitate the payment of U.S. dollars in furtherance of the transport of Iranian petroleum products with the intent to promote a specified unlawful activity, *viz.,* a violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705.

3.    The Defendant Property was seized from Suez Rajan Limited, the owner of the *Suez Rajan*, and Empire Navigation Inc., the technical and operational management company.

## JURISDICTION AND VENUE

4.    This Court has *in rem* jurisdiction over the Defendant Property pursuant to 28 §§ U.S.C. 1345 and 1355.

5.      Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2).

6.      Pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b), this court has jurisdiction for property subject to forfeiture on the high seas.

## FACTS GIVING RISE TO FORFEITURE

**A.      Relevant Entities**

**i.      Government of Iran**

7.      On January 19, 1984, the United States designated Iran as a state sponsor of terrorism.   *See*   https://www.state.gov/reports/country-reports-on-terrorism-2020/iran/.      For 2020, the most recent year for which Country Reports on Terrorism are available, the State Department concluded that "Iran continued its terrorist-related activity in 2020, including support for Hizballah, Palestinian terrorist groups in Gaza, and various terrorist and militant groups in Iraq, Syria, and elsewhere throughout the Middle East."   *Id.*   The State Department further found that "Iran used the Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region," and that "the IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorist activity abroad."   *Id.*   To date, the United States has not delisted Iran as a state sponsor of terrorism.   *See* https://www.state.gov/state-sponsors-of-terrorism/.

**ii.      Iranian Ministry of Petroleum**

8.      According to the Iranian Ministry of Petroleum's website, the ministry "is a state-run organ affiliated with the Executive branch of government" that was established in 1979. https://en.mop.ir/home/.   The ministry reports that it "is tasked with exercising the principle of Iran's ownership of and national sovereignty over oil and gas resources as well as separating governance from administrative tasks in the development of oil and gas industry."   *Id.*   The

3

ministry exercises its authority over the petroleum industry through four subsidiaries – NIOC, the National Iranian Gas Company, the National Iranian Oil Refining and Distribution Company, and the National Petrochemical Company.  *Id.* ("The structural organization of the Ministry comprises a head office and four main subsidiaries – National Iranian Oil Company (NIOC), National Iranian Gas Company (NIGC), National Iranian Oil Refining and Distribution Company (NIORDC) and National Petrochemical Company (NPC).  Through subsidiaries, the Ministry supervises exploration, extraction, marketing and selling of crude oil, natural gas and petroleum products in the country.").

9.      The Iranian government's ownership of petroleum resources stems from Articles 44 and 45 of Iran's constitution.  Article 44 provides in part: "The economy of the Islamic Republic of Iran is to consist of three sectors: state, cooperative, and private, and is to be based on systematic and sound planning.  The state sector is to include all large-scale and mother industries, foreign trade, major minerals, banking, insurance, power generation, dams and large-scale irrigation networks, radio and television, post, telegraph and telephone services, aviation, shipping, roads, railroads and the like; all these will be publicly owned and administered by the State."  https://www.constituteproject.org/constitution/Iran_1989.pdf?lang=en. [1]  Article 45 provides in part: "Public wealth and property, such as uncultivated or abandoned land, mineral deposits, seas, lakes, rivers and other public water-ways, mountains, valleys, forests, marshland, natural forests, unenclosed pastureland, legacies without heirs, property of undetermined ownership, and public property recovered from usurpers, shall be at the disposal of the Islamic government for it to utilize in accordance with the public interest."  *Id.*

---

[1]      The Constitution of the Islamic Republic of Iran was adopted and went into force in 1979.  It has been amended once, on July 28, 1989.

10.     Article 2 of Iran's Oil Law (Sep. 30, 1987) provides: "The country's oil resources are part of the Anfal and public wealth, and according to Article 45 of the Constitution, is at the disposal of the Islamic government, and all facilities, equipment, assets and investments that have been or will be made by the Ministry of Oil and subsidiaries at home and abroad will belong to the Iranian people and to the Islamic government.   The exercise of sovereignty and ownership of oil resources and facilities belongs to the Islamic Government, which according to the provisions and powers enumerated in this law, it is the responsibility of the Ministry of Oil to act in accordance with the general principles and plans of the country."   https://en.mop.ir/portal/home/?news/ 368984/368988/379478/petroleum-law.

11.     On October 26, 2020, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated the Iranian Ministry of Petroleum under Executive Order 13,224 for providing financial support to the Islamic Revolutionary Guard Corps – Quds Force ("IRGC-QF").   *See* https://home.treasury.gov/news/press-releases/sm1165.   OFAC found that "[t]he Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme."   *Id.*

### iii.    Islamic Revolutionary Guard Corps

12.     The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system.   The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations.

13.     The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking."   https://home.treasury.gov/news/press-releases/tg1718.   According to OFAC, "[t]he IRGC and its major holdings, such as the Basij Cooperative Foundation and Khatam al-Anbiya,

have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion-dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses."   https://home.treasury.gov/news/press-releases/sm703.

14.    The IRGC and IRGC-QF use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iranian oil.   Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries … to obfuscate its involvement in selling Iranian oil."   https://home.treasury.gov/news/press-releases/sm767;   *see also* https://home.treasury.gov/news/press-releases/tg1718 ("The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies.").   The Secretary of the Treasury has previously found that holding groups and companies in the petrochemical sector and elsewhere "provide financial lifelines to the IRGC." https://home.treasury.gov/news/press-releases/sm703.

15.    The IRGC generates substantial revenues from the sale of petroleum products. For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime.   These shipments, taken collectively, sold for more than half a billion dollars.   The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels [of] gas oil, bringing in another quarter billion dollars." https://home.treasury.gov/news/press-releases/sm767.

16.    The IRGC uses the proceeds from the distribution of petroleum to fund its terror activities.   OFAC has found that: "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle

East."        https://home.treasury.gov/news/press-releases/sm885;  *see  also*  https://home. treasury.gov/news/press-releases/sm703 ("The profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad."). The Secretary of the Treasury has stated: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people." https://home.treasury.gov/news/press-releases/sm885.

17.     On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13,224, which is "aimed at freezing the assets of terrorists and their supporters." *See* https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm. In part, OFAC found that "[t]he Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC)." *Id.* On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order 13,224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/sm0177.

18.     On April 8, 2019, the President announced that he would designate the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189). *See* https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/. The announcement noted, in part, that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with

the IRGC, you will be bankrolling terrorism." *Id.*   On April 8, 2019, the State Department similarly announced the pending designation of the IRGC, including the IRGC-QF.   *See* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html. That announcement noted that "[T]he IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." *Id.* On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA.   *See* 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.federalregister.gov/ documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a.

19.    The IRGC and IRGC-QF act in foreign commerce with specific aims to threaten U.S. interests and the national security of the United States.   The following is just a brief list of many examples of how the IRGC and IRGC-QF engage in foreign commerce and activities outside the borders of Iran to harm the interests of the United States:

a.    In likely retaliation for the death of former IRGC-QF commander Qasem Soleimani, in 2021, a member of the IRGC used interstate commerce facilities in a failed plot to commit murder-for-hire and provide material support to a transnational murder plot targeting former National Security Advisor John Bolton, https://www.justice.gov/opa/pr/ member-irans-islamic-revolutionary-guard-corps-irgc-charged-plot-murder-former-national.

b.    In January 2007, the IRGC-QF led by Abdul Reza Shahla'i planned an attack in Karbala, Iraq that killed five U.S. soldiers and wounded three others, https://rewardsforjustice.net/rewards/abdul-reza-shahlai/.

c.    In June 1996, the IRGC was responsible for planning the attack on the Khobar Towers in Dhahran, Saudi Arabia, during which 19 U.S. Air Force personnel were killed and more than 350 were injured, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 174 (D.D.C. 2010).    IRGC senior officials recruited the attackers and worked in conjunction with them and Hezbollah, operating out of a terrorist base in the Bekaa or Beqaa Valley in Lebanon where the IRGC provided supplies and funds for the attack.    *Id.*

20.    Through these actions and many others, the IRGC and IRGC-QF's terrorism affects foreign commerce in a manner that harms the interests of the United States, both domestic and abroad.    Indeed, the entire purpose of the IRGC and IRGC-QF's campaigns of terror are to thwart the United States' diplomatic efforts, including its support for peace in the Middle East and recognition of Israel, by threatening the security of U.S. nationals and attempting to instill fear in the citizens of this country located within and outside its territorial boundaries.    *See In re Sealed Case*, 936 F.3d 582, 592 (D.C. Cir. 2019) (criminal defendant's use of drug trafficking to support terrorist organizations "magnifies the effect of his conduct on commerce between the countries where he was operating and the United States").    These terrorist activities undertaken in foreign commerce plainly have a domestic effect on the United States.

### iv.    National Iranian Oil Company

21.    NIOC is the national oil company of Iran and a subsidiary of the Iranian Ministry of Oil.    NIOC describes itself as "one of the largest oil firms in the world with huge hydrocarbon reserves."    https://en.nioc.ir/en-US/en.nioc/5696/page/NIOC-at-a-Glance.    NIOC reports that it is "responsible for organizing and policy-making activities of the oil industry, including exploration, drilling, production, research and development, as well as oil and gas exports."    *Id.*; *see also* https://home.treasury.gov/news/press-releases/sm1165 ("NIOC, overseen by the Ministry

of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran."). According to OFAC, the distribution of NIOC oil "helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies." https://home.treasury.gov/news/press-releases/sm885.

22.    On September 24, 2012, the Department of the Treasury reported to Congress that it had determined that NIOC was an agent or affiliate of the IRGC. *See* https://home.treasury. gov/news/press-releases/tg1718. On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

### v.    Iranian Oil Terminals Company

23.    The Iranian Oil Terminals Company ("IOTC") is a subsidiary of NIOC that operates the Kharg Oil Terminal at Kharg Island, Iran. *See* https://en.nioc.ir/en-US/en.nioc/5699 /page/Subsidiaries (listing IOTC as a subsidiary); *see also* https://www.iotco.ir/en/aboutus/ introductioncompany (stating that IOTC is "one of the companies under [the] umbrella of [the] National Iranian Oil Company"). IOTC describes itself as "an operational, specialized and professional organization that has the duty of all reservation affairs, crude oil, oil products, liquefied gas and marine services export and import operations along with providing measurement and lab services." *Id.* According to IOTC, its responsibilities include "support and sustained continuation of oil and gas production in the country in four operational zones of Kharg Oil Terminals." *Id.* According to Orbis, a corporate reporting service, the government of Iran is the "global ultimate owner" of IOTC.

### vi.    Kharg Oil Terminal

24.    Kharg Oil Terminal is an oil terminal located at Kharg Island, Iran that is operated by IOTC.   The terminal has quays or jetties for loading petroleum onto crude oil tankers.   *See* https://www.iotco.ir/en/oilterminals/kharg.

25.    According to IOTC's website, Kharg Oil Terminal receives oil via pipeline from Iran's South Oilfields, which are operated by the National Iranian South Oil Company ("NISOC"). *See id.*

### vii.    National Iranian South Oil Company

26.    According to NISOC's LinkedIn page, "National Iranian South Oil Company (NISOC) . . . is a government-owned corporation under the direction of the Ministry of Petroleum of Iran and operates as a subsidiary of National Iranian Oil Company."   *See also* https://en.nioc.ir/en-US/en.nioc/5699/page/Subsidiaries (listing NISOC as a subsidiary of NIOC).

### viii.    Company A

27.    Company A acquired the *Suez Rajan* in or around February 2021 pursuant to a sale-leaseback financing in which it purchased the vessel from Suez Rajan Limited and then immediately leased the vessel back to Suez Rajan Limited.

### ix.    *Suez Rajan*

28.    The *Suez Rajan* is a crude oil tanker that is registered in the Marshall Islands with IMO No. 9524475.



*Satellite image of the Suez Rajan captured on May 17, 2022 by the European Space Agency*

**x.      Suez Rajan Limited**

29.      Suez Rajan Limited is a Marshall Islands company.    At all relevant times, it was the bareboat charterer of the *Suez Rajan*.

**xi.      Empire Navigation Inc.**

30.      Empire Navigation Inc. ("Empire") is a Marshall Island company with a branch that operates in Greece and that *inter alia*, manages and operates oil tankers.    At all relevant times, Empire operated the *Suez Rajan* pursuant to a management agreement with Suez Rajan Limited.

**xii.     Company B**

31.      Company B is a company organized in Hong Kong that was chartering the *Suez Rajan* at the time of the events in question.

**xiii.    M/T *Virgo***

32.      The M/T *Virgo* (IMO No. 9236250) is owned by Company C and is registered in Panama. The *Virgo* is 332 meters long and 58 meters wide.



*Satellite image of the VIRGO captured on February 1, 2022 by the European Space Agency*

33.    A Confidential Human Source ("CHS"), who is an expert in the maritime industry and has proven reliable in the past, has reviewed satellite imagery of the *Virgo* at the Kharg Oil Terminal and engaging in ship to ship ("STS") transfers with vessels carrying Iranian oil.[2] According to the CHS, since late November 2020, the *Virgo* has transported roughly 18 million barrels of Iranian crude oil to China, either directly or indirectly via STS transfers.   The satellite imagery below depicts eight instances, including the present case, in which the *Virgo* has loaded Iranian oil that the *Virgo* subsequently transported to China.

---

[2]    To date, this CHS and the CHS's company have been paid approximately $56,000 for time and professional services in this investigation and related investigations.   The United States has additionally reimbursed the CHS for travel costs incurred in related investigations.



*Dec. 1, 2020: The Virgo received Iranian oil in an STS transfer in the Gulf of Oman.*



*Apr. 24, 2021: The Virgo received Iranian oil in an STS transfer in the Gulf of Oman.*



*June 21, 2021: The Virgo loaded oil at Berth 11 of the Azarpad, Kharg Oil Terminal.*



*July 24, 2021: The Virgo loaded oil at Berth 11 of the Azarpad, Kharg Oil Terminal.*



*Oct. 4, 2021: The Virgo loaded oil at Berth 11 of the Azarpad, Kharg Oil Terminal.*



*Dec. 6, 2021: The Virgo loaded oil at Berth 11 of the Azarpad, Kharg Oil Terminal.*



*Jan. 17, 2022: The Virgo loaded oil at Berth 11 of the Azarpad, Kharg Oil Terminal.*



*Mar. 3, 2022: The Virgo loaded oil at Berth 11 of the Azarpad, Kharg Oil Terminal.*

**B.    The _Virgo_ loaded the Defendant Property at the Kharg Oil Terminal.**

34.    On or around January 14, 2022, the _Virgo_ entered the Persian Gulf from the Gulf of Oman.    The _Virgo_ headed to a point west of Kharg Island, Iran while specifying over its Automatic Identification System ("AIS")[3] that its destination was "FOR ORDERS," without identifying a port or other destination.

35.    While in the Persian Gulf, the _Virgo_ began using a secondary AIS transponder to broadcast a false location.    Specifically, on January 17, 2022, at approximately 7:31 UTC, the _Virgo_ reported via AIS that its position was 29.3996° N, 49.46673° E (Persian Gulf, west of Kharg Island, Iran).    Satellite imagery from the European Space Agency ("ESA") reflects that the _Virgo_ was not present at that reported location at that date and time.



_Jan. 17, 2022: ESA satellite imagery reflects that the Virgo was not present at its AIS reported position._

---

[3]    AIS is a vessel tracking system that uses transceivers on ships to identify their positions, courses, and speeds, among other information.

36.     In fact, on or around January 17, 2022, ESA satellite imagery captured the *Virgo* at berth 11 of the Azarpad at the Kharg Oil Terminal.   The Azarpad, which is also known as the Western Jetty, is a quay located approximately 1455 meters off the western coast of Kharg Island that can service vessels of up to 500,000 tons for loading petroleum.     *See* https://www.iotco.ir/en/oilterminals/kharg.



*Jan. 17, 2022: ESA satellite image of Virgo at berth 11 of the Azarpad, Kharg Oil Terminal*

37.     On or around the evening of January 17, 2022, after loading the Iranian oil, the *Virgo* departed Kharg Island and resumed its regular AIS transmission.   The *Virgo*'s AIS transmissions now reported a draft depth of 20.5 meters, indicating that the vessel was fully laden. The CHS confirmed that the *Virgo* was empty before it berthed at the Kharg Oil Terminal and fully laden thereafter.

38.     According to AIS data, the *Virgo* subsequently departed the Middle East region via the Gulf of Oman and headed down the Arabian Sea, passing the south coast of Sri Lanka towards the Strait of Malacca.   On or around January 30, 2022, while transiting the Strait of Malacca, the *Virgo* broadcasted over AIS at 09:01 UTC that its reported destination was the "FAR EAST,"

without specifying further details regarding a port or country.    On or around January 31, 2022, the *Virgo* entered the South China Sea.



*Path of the Virgo, as reported by AIS, as it traveled from the Persian Gulf to the Strait of Malacca*

**C.**    **Company B Chartered the *Suez Rajan* to Carry Cargo to China.**

39.    On or around February 3, 2022, Company B entered into a time charter agreement with Suez Rajan Limited to charter the *Suez Rajan*. Company B sent two wire transfers denominated in U.S. dollars to Suez Rajan Limited to pay for *Suez Rajan* chartering fees. Specifically, as part of the transaction involving the ship-to-ship transfer ("STS") described below, Company B sent Empire Navigation a wire transfers of $712,500 on February 11, 2022, and $516,233.95 on February 16, 2022.

**D.**    **The *Suez Rajan* Engaged in an STS Transfer with the CS *Brilliance*.**

40.    On or about January 18, 2022, the *Suez Rajan* sailed from Dalian, China to Singapore East Outside Port Limits (EOPL).    At this time, the vessel was empty.    The *Suez*

*Rajan* arrived in Singapore on February 2, 2022.    At this time, as noted, the bareboat charterer for the vessel was Suez Rajan Limited and the vessel was being operated by Empire.

41.    On February 4, 2022, an individual at Company B directed the captain of the *Suez Rajan*, who worked at Empire's direction, to conduct STS with the M/T *CS Brilliance* (IMO No. 9153513) ("*Brilliance*") and another unnamed vessel.

42.    The voyage instructions that Company B sent to the captain of the *Suez Rajan* on February 4, 2022 identified Company B as the "ACCOUNT" and directed the *Suez Rajan* to conduct a loading operation of "4,000 [barrels] + / - 10%," with the *Brilliance* at the Tanjung Pelepas Port in Malaysia on or about February 4 or 5, 2022, and then another loading operation of "1,100,000 [barrels] +/-10% (UP TO [VESSEL] MAX CAPACITY ON SAFE DRAFT)" at the EOPL anchorage off Singapore on or about February 5 or 6, 2022.    The instructions did not identify the vessel for the second loading operation other than the notation "STS."    The Voyage Instructions indicated that the final discharge port for the crude oil was "CHINA FOR ORDER."

43.    Prior to the loading of the *Suez Rajan* from the *Brilliance*, Person A, an employee of Empire, contacted the captain of the *Suez Rajan* and informed him that the two different cargoes loaded from *Brilliance* and the *Virgo* would be declared as one loading operation.    Person A directed that the sum of both STS quantities (i.e., oil loaded from the *Brilliance* and *Virgo*) would be reported on the vessel deck logbook and oil record book, as well as all other documents, as one single STS loading operation from the *Brilliance*.    Person A informed the captain of the *Suez Rajan* that the total quantity of oil to be reported as loaded from the *Brilliance* was approximately one million barrels.    The captain of the *Suez Rajan* informed Person A that it was important to accurately report both STS operations, but Person A stated this was the agreement between Company B and Empire.

44.     According to public sources, the *Brilliance* is an oil tanker that is registered in the Marshall Islands and used for floating storage. The *Brilliance* has been linked to the Iran oil trade based on its past receipt of cargo from Kharg Island, Iran

45.     On or about February 6, 2022, the *Suez Rajan* engaged in an STS transfer with the *Brilliance*, as directed by Company B, in which the *Suez Rajan* took on approximately 4,000 barrels of crude oil.

46.     AIS data reflect that the *Suez Rajan* engaged in the STS transfer with the *Brilliance* between approximately 13:36 UTC on February 5, 2022, and approximately 3:58 UTC on February 6, 2022, a duration of just over 14 hours. The transfer took place in the anchorage of Tanjung Pelepas, Malaysia, directly west of Singapore.

47.     On or around February 5, 2022, at approximately 22:15 UTC, the *Suez Rajan* reported a new draft depth of 16.8 meters via AIS.   Per Person A's instruction to the captain of the *Suez Rajan*, on or around February 5, 2022, at approximately 22:53 UTC, the *Suez Rajan* updated its draft depth to 16.5 meters on AIS.   The captain of the *Suez Rajan* informed Person A that manipulating the AIS to change the draft could raise questions with authorities in the Singapore Straight, or individuals aboard the *Brilliance*.   But Person A told him that Empire had done this in the past, and if the captain had any concerns, he could call the captains of other vessels for clarification on how Empire has done this activity in the past.

48.     The *Suez Rajan*'s reported draft depth following the STS transfer would make it appear that the vessel had accepted approximately 1,063,000 barrels of crude oil.   However, due to the relatively short amount of time spent together, it is estimated that little if any cargo was actually transferred and the engagement was simply a ruse so the *Suez Rajan* would appear fully laden.

49.     The *Suez Rajan*'s vessel log contains a crossed-out entry dated February 6, 2022. The crossed-out entry indicates that that the *Suez Rajan* engaged in an STS transfer with the *Brilliance* at Tanjung Pelepas, Malaysia and took on approximately 979,935 barrels of crude oil.

50.     The *Suez Rajan*'s vessel log then bears an entry dated February 6, 2022 that is not crossed out.    The new entry indicates that the *Suez Rajan* engaged in an STS transfer with the *Brilliance* at Tanjung Pelepas, Malaysia and took on just approximately 3,931 barrels of crude oil.

51.     The captain and chief officer (who also worked at the direction of Empire) of the *Suez Rajan* made these falsified records at the instruction of Person A.

52.     On or around February 6, 2022, the captain of the *Suez Rajan* issued multiple letters of protest in connection with the STS transfer with the *Brilliance*.    One of the letters of protest indicates that the *Suez Rajan* received just approximately 3,914 barrels of oil rather than approximately 3,919 barrels of oil, as reported by the *Brilliance*.    Another protest letter indicates that the *Brilliance* failed to issue a certificate of quality, a certificate of quantity, and a certificate of origin to the *Suez Rajan* in connection with the STS transfer.

**E.     The *Virgo* transferred the Defendant Property to the *Suez Rajan***

53.     On or about February 13, 2022, the *Suez Rajan* engaged in an STS transfer with the *Virgo* near the EOPL anchorage off Singapore.    The *Virgo* transferred 976,483 barrels of crude oil to the *Suez Rajan* during the STS.



*Satellite imagery of Suez Rajan engaged in an STS with Virgo on February 13, 2022*

54.     Vessel logs from the *Suez Rajan* corroborate satellite images of the STS between the *Suez Rajan* and the *Virgo*.    Specifically, one vessel log indicates that the *Suez Rajan* and *Virgo* commenced mooring in the Singapore EOPL on February 12, 2022, and that an STS was in progress between the two vessels on February 13, 2022.    A second vessel log indicates that the *Suez Rajan* completed loading approximately 975,989 barrels of crude oil in an STS transfer with the *Virgo* on February 14, 2022.

55.     On February 14, 2022, the captain of the *Suez Rajan* sent an email to numerous Company B and Empire email addresses, attaching records relating to the STS transfer with the *Virgo*.    Among the records that the captain forwarded was an activity log entitled "Statement of Fact-Loading," which documented that the *Suez Rajan* moored with the *Virgo* and commenced loading on February 12, 2022 and completed loading on February 14, 2022.

56.     On February 14, 2022, the captain of the *Suez Rajan* issued multiple letters of protest in connection with the STS transfer with the *Virgo*.    Among those letters of protest was a

"letter of protest for short loading," which indicates that the *Suez Rajan* only received 976,483 barrels of crude oil when *Virgo* was supposed to deliver 1,100,000 million barrels of crude oil, plus or minus 10 percent.

57.    During the STS transfer with the *Virgo*, the *Suez Rajan* appears to have continued reporting its true location via AIS.    The *Virgo*, however, reported a location that was approximately eight miles away from the *Suez Rajan*.    For example, on or around February 12, 2022, at approximately 03:16 UTC, the *Virgo* reported via AIS that it was located at 1.791172° N, 104.7484° E. Satellite imagery reflects that the *Virgo* was not at that location at that time.



*Feb. 12, 2022: The Virgo was not located at its reported AIS location.*

58.    Instead, satellite imagery reflects that, on or around February 12, 2022, at approximately 03:16 UTC, the *Virgo* was in fact taking position parallel to the *Suez Rajan* to initiate the STS transfer.



*Feb. 12, 2022: The Virgo was in fact mooring with the Suez Rajan to commence an STS transfer.*

59.    On or about February 18, 2022, Person A instructed the captain and chief officer of the *Suez Rajan* to correct the oil record book by reporting the true quantities of oil loaded from both the *Brilliance* and the *Virgo*.    Prior to correcting the oil record book, the captain provided a copy of the draft changes to Person A for review and approval.    Once Person A reviewed and approved the changes, the captain instructed the chief officer to make the changes in the oil record book (reflecting the two separate STS operations).

60.    The individuals and entities involved conspired to make it appear that the *Suez Rajan* received the oil, in its entirety, from the *Brilliance* rather than primarily from the *Virgo*, to obfuscate that it was overwhelmingly of Iranian origin.    Specifically, the STS transfer with the *Brilliance* in which the *Suez Rajan* loaded just 4,000 barrels of oil, the *Suez Rajan*'s reported draft depth following the STS transfer with the *Brilliance* that suggested the vessel was fully laden, the crossed out entry in the *Suez Rajan*'s log reporting that it had received approximately 979,935 barrels of crude oil from the *Brilliance* when in fact it had received just 4,000 barrels, and the

*Virgo*'s false AIS reporting during the STS transfer with the *Suez Rajan* all appear designed to conceal that virtually all of the Defendant Property originated from the *Virgo* and previously, Kharg Oil Terminal.

**F.    Company B Paid Chartering Fees to Empire Through the U.S. Financial System.**

61.    Company B used the U.S. financial system to pay for chartering fees associated with the shipment of the Defendant Property.    Specifically, Company B sent Empire a wire transfers of $712,500 on February 11, 2022, and $516,233.95 on February 16, 2022.

**G.    The Relevant Parties Failed to Obtain a License from OFAC to Transport Iranian Oil.**

62.    OFAC, which is located in the District of Columbia, has reported that, prior to the initiation of the present investigation, no licenses were sought by the relevant entities related to the above-described U.S. financial transactions and STS of the Iranian origin oil which would authorize the use of the *Suez Rajan* to load or transport Iranian-origin oil.

**COUNT ONE – FORFEITURE**
**18 U.S.C. § 981(a)(1)(G)(i)**

63.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 62 above as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(G)(i).

64.    The IRGC is a designated foreign terrorist organization.

65.    The IRGC-QF is a designated foreign terrorist organization.

66.    The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as foreign assets of the IRGC and the IRGC-QF, both designated foreign terrorist organizations, which have engaged in planning and perpetrating federal crimes of

terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property.

67.     The Defendant Property also, or alternatively, affords persons (including, without limitation, NIOC, IOTC, NISOC, and Company B) sources of influence for the IRGC and the IRGC-QF within the meaning of 18 U.S.C. § 981(a)(1)(G)(i).

## COUNT TWO – FORFEITURE
### 18 U.S.C. § 981(a)(1)(A)

68.     The United States further incorporates by reference the allegations set forth in Paragraphs 1 to 62 above as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(A).

69.     The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in and/or facilitating a violation of 18 U.S.C. § 1956(a)(2)(A), and any property traceable to such property.

\*      \*      \*

WHEREFORE, the plaintiff prays that all persons who reasonably appear to be potential claimants with interests in the Defendant Property be cited to appear herein and answer the complaint; that the defendant property be forfeited and condemned to the United States of America; that upon Final Decree of Forfeiture, the United States Marshal dispose of the defendant property according to law; and that the plaintiff have such other and further relief as this Court deems proper and just.

Dated:  March 31, 2023
        Washington, D.C.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:    /s/ *Rajbir Datta*
        RAJBIR DATTA
          N.Y Bar 5206073
        BRIAN P. HUDAK
        STUART D. ALLEN
        Assistant United States Attorneys
        601 D Street, N.W.
        Washington, D.C. 20579
        (202) 252-7687 (Datta)
        Rajbir.Datta@usdoj.gov

MATTHEW G. OLSEN
Assistant Attorney General
National Security Division

By:     /s/ David Lim
        DAVID LIM
        Acting Deputy Chief
        Counterintelligence and Export Control
        National Security Division
        U.S. Department of Justice

## <u>VERIFICATION</u>

I, Cindy Burnham, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 31st day of March 2023.


   */s/ Cindy Burnham*
Special Agent Cindy Burnham
Federal Bureau of Investigation


I, Kosta Stylos, a Special Agent with the Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 31st day of March 2023.


   */s/ Kosta Stylos*
Special Agent Kosta Stylos
Homeland Security Investigations